STATE of Missouri,
Plaintiff-Respondent,

v.

Donald W. GALLIMORE,
Defendant-Appellant.

No. 12281.

Missouri Court of Appeals,
Southern District,
Division One.

April 14, 1982.

Motion for Rehearing or to Transfer to
Supreme Court Denied May 3, 1982.

John D. Ashcroft, Atty. Gen., Kelly Klopfenstein, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

David Robards, Public Defender, Joplin, for defendant-appellant.

TITUS, Judge.

Defendant Donald W. Gallimore was charged with first degree robbery (§ 569.-020)[1] for having, on December 4, 1980, forcibly stolen "approximately $900.00 in the possession of Randy Arrowood[2], and in the course thereof defendant, or Robert D. Gallimore, Jr.[3], another participant in the crime, displayed and threatened the use of

1. References to statutes and rules are to RSMo 1978 and Missouri Rules of Court 1982.

2. Randy's trial testimony was that $782 in money and checks was taken by the robber and this included $500 or $600 in cash.

3. Robert D. Gallimore, Jr., is defendant's brother.

. . . a deadly weapon and dangerous instrument." A Jasper County jury declared defendant guilty of the charged class A felony and assessed punishment at imprisonment for a term of 10 years. § 558.011–1(1). Defendant's motion for a new trial was tardily filed [Rule 29.11(b)] and the court entered judgment and sentenced defendant in accordance with the verdict. Defendant appealed.[4]

Inter alia, defendant here asseverates the trial court erred in not sustaining his motion for judgment of acquittal made at the conclusion of the trial testimony because there was insufficient evidence to support the guilty verdict. The sufficiency of the evidence to support a criminal conviction is reviewable on appeal as plain error [Rule 29.12(b)] and we proceed with such a review. *State v. Neal*, 610 S.W.2d 358, 359[2] (Mo.App.1980).

■ The robbery occurred near 7:50 p.m. December 4, 1980, at the Stop and Go convenience store located on North Schifferdecker Avenue in Joplin. Just south of the store is an abandoned trackless railroad right of way that extends northwest and southeast from the north-south avenue. A block southeast from the store the right of way, at the angle indicated, traverses an area of about six square blocks in which no streets or avenues cross the right of way. At the southeast corner of this six block area, the right of way crosses the intersection of east-west Second Street and north-south Winfield Avenue. As the time of the setting of the sun is a matter of judicial notice, *Leek v. Dillard*, 304 S.W.2d 60, 64[3] (Mo.App.1957), we acknowledge that on the day of the robbery sunset occurred at 4:56 p.m. or some three hours before the crime herein was committed.

At the time of the robbery Randy Arrowood, a Stop and Go employee, was alone at the store when a lone man entered the store and demanded money. The entrant was wearing a blue knitted ski mask, gray-blue cotton gloves, blue jeans, a denim jacket and was armed with a long single-edged razor blade. The man, a Caucasian with a "heavy brown beard," demanded money and threatened Randy with the blade. Randy first obtained money from the cash register and activated an alarm therein connected with the Joplin Police Department. He also gave the robber money and checks from beneath the counter, a paper sack and a bank zipper bag. When the robbery was completed, the robber ran out of the store and around the west side of the building. To Randy's knowledge, the robber was alone, had no accomplice and "acted by himself." Randy testified the defendant, who was then in the courtroom, was significantly taller than the robber and agreed that if the robber "is in this courtroom, he is hiding."

On December 4, 1980, two boys, Richard Clemons and Scott Thomas, so they testified, were driving motorcycles northwesterly along the railroad right of way from the Second and Winfield intersection en route to the Stop and Go. Clemons placed the time of the trip at "that afternoon or evening" whereas Thomas simply said "It was dark." The "dirt bike" Clemons rode was not equipped with a headlight and the headlight on the cycle Thomas rode was not burning. As the two neared the middle of the previously described intersectionless six block square area traversed by the right of way, they encountered a stuck truck also headed northwest. The two boys stopped southeast of the truck and were approached by "a couple of guys" who "more or less" demanded a ride "back to the end of the tracks." One of the "guys" got on the dirt bike behind Clemons and the other got on the rear of the motorcycle Thomas was operating. Thomas turned his machine around before Clemons did his and took his passenger to Second and Winfield where the passenger alighted and disappeared. By the time Clemons reversed the direction of the dirt bike and reached the aforementioned intersection, police officers had arrived and halted the duo. The police talked with Clemons and his passenger and released them because, as the police later

4. Defendant's trial counsel and counsel on appeal are not same.

testified, neither matched the description of the lone robber relayed by the store clerk nor wore clothing reportedly worn by the robber. Clemons' passenger then abandoned the dirt bike. Neither Clemons nor Thomas knew at trial what their motorcycle passengers "looked like" and when asked if he had seen the defendant there, Thomas answered "No, sir." However, Thomas later told investigating officers that "out of the corner" of his eye he had seen one, he was not certain which, of the motorcycle passengers "throw something in the weeds" alongside the right of way. After being led by Thomas to the area of discard, the officers found a pair of gloves and a ski mask which the store clerk identified at trial as having been worn by the man who robbed him. Clemons and Thomas were not asked at trial, nor did they volunteer, if either or both of their riders wore beards or were carrying a paper sack or a bank zipper bag.

Detective Howard of the Joplin Police Department testified that in response to the alarm activated by the store clerk, he was traveling west on Second Street en route to the Stop and Go and "As I passed Second and Winfield, I observed some lights coming down the old railroad bed track there. It appeared to be a motorcycle." Howard turned around to return to the intersection and as he did so he saw what "appeared to be a dirt bike" cross the intersection and continue southeasterly upon the right of way. The passenger of the dirt bike, Howard said, "was wearing a blue coat and blue jeans." When Howard got back to the intersection he intercepted and stopped another motorcycle traveling southeast on the right of way. The detective testified that when he initially halted the second cycle, "I couldn't see the subjects because of the headlights of their motorcycle." Howard recounted that the driver of the motorcycle he stopped identified himself as "Dickey Clemons, Jr." and the passenger identified himself as "Scott Bentlage," although Howard later learned (without explaining how) the passenger was the defendant. After talking with the two, Howard let them go because neither fit the description of the robber and the motorcycle passenger was wearing "a tan type sweat shirt, and . . .

tan corduroy jeans . . . . No jacket." Again we note that the witness Howard was not asked and did not volunteer whether either motorcycle passenger wore a beard or appeared to be carrying any kind of an object. *As an aside:* Detective Howard's testimony does not "jibe" with that given by Clemons and Thomas. Clemons said he was driving the dirt bike which had no headlight and that the headlight on the motorcycle driven by Thomas which was first through the intersection was extinguished. To the contrary, the detective stated the dirt bike was first through the intersection and had a burning headlight and that the headlights on the motorcycle he stopped and which was driven by Clemons initially blinded him because of their intensity.

Although the two boys, Clemons and Thomas, swore at trial they did not recognize or know the two who "more or less" demanded rides on their motorcycles, a police officer who investigated the robbery with Detective Howard testified without objection that when Clemons was subsequently interrogated at home, Clemons said he knew the two riders were brothers and knew their first names. The officer was further allowed to state that during this interview, Clemons' father spoke privately with his son and thereafter Clemons told the officers the passengers had been the defendant and "Robbie Gallimore."

■ For some reason unexplained satisfactorily by the state's evidence, the investigation of the robbery took the police to 2308½ West Third Street, which is occupied by a heating and air conditioning business conducted by the father of defendant and Robert Gallimore. (On cross-examination of defendant it was suggested defendant gave Detective Howard this address as his residence although this was denied by defendant. Furthermore, this investigation occurred before defendant was interrogated by the police.) The officers found a small broken window pane to the entrance door and when the building was entered they smelled smoke. Inside a steel drum the officers found what appeared to be broken glass, the burned remains of checks and papers, the burned residue of some kind of

cloth with a zipper and an empty straight razor handle. Although no one, including the robbed store clerk, could identify any of the drum's contents as having been taken or employed in the robbery, over defendant's objections the trial court permitted the introduction of the contents as exhibits in the case. Moreover, an investigating police officer testified that he was unaware of any checks or money taken in the robbery ever being recovered.[5]

Except for rebuttal, the state's final witness, a policeman who participated in the arrest of defendant and his brother at 6:44 a.m. on December 5, 1980, over objection was permitted to testify that defendant said he and his brother had each been paid $250 by their father for work they had completed the previous day. This witness said that defendant admitted giving Detective Howard a false name and that he did so because his car had just recently been repossessed "and he thought the cops were looking for him" because of that matter. The policeman said at the time of the arrest only defendant's brother, not defendant, had any money. We do not have State's Exhibit 3, representing money taken from defendant's brother at the time of his arrest and consequently, do not know the amount thereof. However, in closing argument, state's counsel told the jury the money consisted of 55 one dollar bills, 20 five dollar bills, 22 quarters, 17 dimes and 18 nickels for a total of $163.10 which differs considerably from the $500 or $600 in cash which the store clerk testified was taken at the time of the robbery. We once again observe that no witness for the state testified that either defendant or his brother wore a beard at any time before, during or after the robbery or at the time the two were arrested.

Robert Burch testified for the defense that he had been with the defendant working on his truck at 2308½ W. Third Street the entire afternoon. In the evening of December 4, 1980, Burch, while accompanied by defendant, drove his father-in-law's pickup truck northwesterly upon the previously described right of way in search of railroad ties his wife's grandmother wanted as borders for her flower beds. At the point previously described, the truck became stuck. The efforts of Burch and defendant for "about an hour" to free the truck were unsuccessful until "about 8:30" when a motorcycle driven by Richard Clemons arrived on the scene. Burch recounted that defendant's brother was not with them at any time and that Clemons, as far as he knew, was alone. Clemons briefly lent his efforts to freeing the truck and left with the pronounced intention of seeking assistance. Defendant left with Clemons but shortly returned to the truck saying that Clemons intended to contact Burch's father-in-law about the matter and that he, the defendant, was leaving because the father-in-law didn't like his brother. Burch and defendant arranged to meet at a steakhouse later and defendant left. After the father-in-law arrived with a truck and some policemen and the truck was freed, Burch went to the steakhouse where he met defendant. After a couple of drinks Burch went home. Burch testified that defendant did not appear to have much money while at the steakhouse because defendant had "asked me to buy him a drink."

Defendant's trial testimony generally coincided with Burch's. In addition he said that he stayed at the steakhouse until it closed and then he, his brother and two other boys just "rode around all night long" until he was arrested early the following morning. At the time of the arrest, defendant was possessed of $1.86 and said he didn't know how much money his brother had. Defendant also testified that until he met up with his brother at the steakhouse he had not seen the brother until the early morning of December 4.

The mother of defendant testified that defendant, herself, her husband, her son Robert and an employee each had a key to

---

5. Physical evidence, i.e., exhibits, must be connected with both the crime and the defendant to be admissible in a criminal trial. As the sparse foundation evidence was inadequate to establish these exhibits' connection to the crime or to the defendant or defendant's brother, the court nisi erred in admitting these objects as exhibits in the case. *People v. Rogers*, 42 Ill. App.3d 499, 1 Ill.Dec. 287, 289, 356 N.E.2d 413, 415[2] (1976).

the shop at 2308½ W. Third Street. She said there had been break ins at the shop before the one discovered on December 4 and on that day defendant was at the shop at 9 a.m. when she had arrived and remained for the "biggest part of the day" until leaving sometime in the afternoon.

As seen, the information on which the case was tried charged that defendant forcibly stole money in the possession of the store clerk, and in the course of the robbery defendant, or his brother "another participant in the crime, displayed and threatened the use of what appeared to be a deadly weapon and dangerous instrument." As required by Missouri Approved Instructions—Criminal 2d Ed. (hereinafter MAI–CR2d) the trial court, inter alia, instructed the jury "... A person is criminally responsible for the conduct of another in committing a particular offense when, *either before or during the commission of an offense*, with the purpose of promoting the commission of that offense he aids such other person in committing that offense. The presence of a person at or near the scene of an offense at the time it was committed is alone not sufficient to make him responsible therefor, although his presence may be considered together with all of the evidence in determining his guilt or innocence." (Emphasis supplied). MAI–CR2d 2.10; § 562.041–1(2). The trial court additionally charged the jury: "If you find and believe from the evidence beyond a reasonable doubt: First, that on December 4, 1980 ..., the defendant and another stole money in the possession of [the store clerk], and Second, that the defendant and another in doing so threatened the immediate use of physical force on or against [the store clerk] for the purpose of forcing [the store clerk] to deliver up the money, and Third, that in the course of stealing the property, the defendant and another used or threatened the immediate use of a dangerous instrument against [the store clerk], and Fourth, that the conduct referred to in the above paragraphs was either the conduct of the defendant or the conduct of another for which the defendant is criminally responsible as provided [in the first quoted instruction, supra] then you will find the defendant

guilty of robbery in the first degree ...." MAI–CR2d 23.02 and 2.12.

In deciding the sufficiency vel non of the evidence to support a conviction, this court is required to view the evidence in the light most favorable to the state, disregard all evidence and inferences unfavorable to the state, accept all substantial evidence and legitimate deducible inferences flowing therefrom which tend to support the verdict and reject contradictory and contrary evidence. *State v. Montgomery*, 591 S.W.2d 412, 413[1] (Mo.App.1979). However, when as here, a conviction is predicated wholly on circumstantial evidence, the circumstance and facts upon which the state relies must be consistent with each other and with the guilt of defendant and inconsistent with any reasonable theory of his innocence. Though the evidence need not be conclusive of guilt nor demonstrate the impossibility of innocence, yet if the evidence merely raises a suspicion that defendant committed the charged crime it is insufficient to support a conviction. Of course, the state must prove each and every essential element of the charged crime. *State v. McCall*, 602 S.W.2d 702, 706[10, 11] (Mo.App.1980).

Based upon the information, the evidence most favorable to the prosecution and the instructions repeated above, the state's alternative theories of defendant's guilt were (1) that defendant physically went into the store and committed the robbery, or (2) that defendant, either before or during the commission of the robbery and with the purpose of promoting the commission of the crime, aided his brother Robert D. Gallimore, Jr., who allegedly was the person that physically went into the store and committed the robbery.

Clearly the evidence established the store clerk had been robbed by a lone man who had a heavy brown beard and was dressed in blue jeans and a denim jacket. Upon leaving the store after the robbery, the clerk said the robber ran around the west side of the building which is opposite the direction the "couple of guys" were traveling when they "more or less" demanded rides on the motorcycles Clemons and Thomas were driving some two and a

half blocks southeast of the robbed store. As repeatedly noted in this opinion, no witness testified defendant sported a beard of any description at or near the time of the robbery. When seen by Detective Howard, defendant wore no jacket and was clothed in a tan sweat shirt and tan corduroy pants—not blue jeans and a denim jacket as the robber reportedly wore. The store clerk acknowledged that defendant was significantly taller than the robber and was not the person who entered the Stop and Go and committed the robbery. Additionally, it was never suggested defendant had ever been possessed of any money or checks taken in the robbery or of any object employed in the commission of the crime. The law rightfully presumes a defendant to be innocent until his guilt of the charged crime is established beyond a reasonable doubt [*State v. Murphy*, 356 Mo. 110, 114, 201 S.W.2d 280, 283 (banc 1947)], and no such evidence was introduced in the trial of the instant case to prove defendant was the person who actually robbed the store clerk. Furthermore, if, arguendo, it be assumed, and we make no such assumption, the money found on the person of defendant's brother at the time of his arrest was part of the money taken in the robbery, it may not be inferred from the fact of the brother's possession alone that defendant either committed or participated in the robbery in which the money was stolen. *State v. Gonzales*, 533 S.W.2d 268, 273[9] (Mo.App.1976). Also, ceding defendant was a motorcycle passenger, this fact did not place him inside the Stop and Go as the robber thereof. In our opinion it clearly appears that the state produced no substantial evidence, nor, in fact, any evidence at all, that it was defendant who actually entered the Stop and Go market and robbed the clerk therein.

In considering whether the evidence most favorable to the state proved defendant was criminally responsible for the conduct of the person who actually entered the store and robbed the clerk, we are held to the requirements of § 562.041 which provide that before defendant can be held guilty on that score it was necessary for the state to prove beyond a reasonable doubt that defendant *either before or during* the commission of the robbery and with the purpose of promoting its commission, aided or agreed or attempted to aid the robber in planning, committing or attempting to commit the offense.

As already observed, the store clerk testified that to his knowledge the lone man who entered the store and robbed him was alone, had no accomplice and "acted by himself." There was no evidence that defendant was ever at the store or acted as a lookout for the robber or later had any of the fruits of the crime in his possession. Cf. *State v. Irby*, 423 S.W.2d 800, 802 (Mo. 1968). Nothing in the testimony of any witness even suggests that *before or during* the commission of the robbery, defendant, for the purpose of promoting its commission, aided or agreed or attempted to aid the robber in planning, committing or attempting to commit the offense. The most that can be said for the state's case is that it places the defendant about two and a half blocks southeast of the robbed store *after* the commission of the crime. Even if it could be inferred that defendant was then, i.e., after the commission of the crime, aiding or attempting to aid the robber, under § 562.041 defendant is not guilty as charged because accessories after the fact are not accessories before or during the fact. *State v. Martin*, 428 S.W.2d 489, 490–491[1] (Mo.1968). Defendant's presence two and a half blocks from the scene of the crime after its commission, or even while it is being committed, is insufficient to establish that he was an accomplice-principal or an aider or abettor. *State v. Lewis*, 539 S.W.2d 451, 453[3] (Mo.App.1975). The jury may have inferred defendant was guilty by reason of his association with his brother after the crime was committed. However, defendant may not be connected merely because of his association with his brother after the fact. Strong suspicions may not be properly employed to convict a defendant. Under our system of jurisprudence for there to be a proper conviction there must be some evidence directly linking defendant to the commission of the crime for which he is charged and there was no such evidence in this case. *State v. Miller*, 536 S.W.2d 524, 527 (Mo.App.1976).

The judgment of the circuit court is reversed because there was insufficient evidence in support of defendant's conviction. Under such circumstance the defendant must be discharged. *State v. Basham*, 568 S.W.2d 518, 521[3] (Mo. banc 1978). It is so ordered.

GREENE, P. J., and FLANIGAN, J., concur.