STATE OF NORTH CAROLINA v. BARNEY K. HUANG

No. 8910SC577

(Filed 7 August 1990)

**Rape and Allied Offenses § 4 (NCI3d) — assault on a female — post-traumatic stress disorder — not admissible**

The trial court erred in a prosecution for assault on a female and attempted second degree rape by admitting a psychologist's testimony concerning post-traumatic stress disorder where the probative value was outweighed by the danger of unfair prejudice in that the testimony not only directly implicated defendant, but also encouraged the jury's outrage about the injustice of defendant's alleged act. N.C.G.S. § 8C-1, Rule 403.

**Am Jur 2d, Rape § 68.5.**

APPEAL by defendant from judgment entered 9 December 1988 by *Judge J. B. Allen, Jr.* in WAKE County Superior Court. Heard in the Court of Appeals 16 January 1990.

STATE v. HUANG

[99 N.C. App. 658 (1990)]

*Lacy H. Thornburg, Attorney General, by Doris J. Holton, Assistant Attorney General, for the State.*

*John T. Barrett for defendant-appellant.*

GREENE, Judge.

Defendant Barney K. Huang was tried by jury on charges of attempted second-degree rape and assault on a female. The jury acquitted him of attempted second-degree rape, but found him guilty of assault on a female, in violation of N.C.G.S. 14-33(b)(2) (1986). The trial court imposed a two-year sentence.

Defendant and the prosecutrix Grace Lee Wang (Ms. Wang) gave conflicting testimony about the incident giving rise to this prosecution. Each claimed to be the victim of the other's sexual attack.

Defendant testified that at the time of trial he was fifty-eight years old and that he held a Ph.D. in Agricultural Engineering. He had worked at North Carolina State University for over twenty-five years and had been a full professor since 1973. Defendant is about 5'3" and weighs 135 pounds. Defendant's ties to Ms. Wang's family extend back thirty years to when defendant knew her father. Defendant has known Ms. Wang since she was about five years old. In 1971, Ms. Wang married one of defendant's co-workers at N.C. State University. The Wang and Huang families were close friends. The two families socialized together about once a month.

On the morning of Sunday, 19 June 1988, the two families attended a conference of the Chinese Scholar Association for the Southeastern United States. The Huangs invited the Wangs to their home afterward so that their young boys, ages seven and nine, could play together. Due to conference obligations, Mr. Wang was unable to accept the invitation, but Ms. Wang and her son arrived at defendant's house after three o'clock that afternoon. Later in the afternoon, defendant's wife left the Huang residence to take friends to the airport, about a thirty-minute drive. Ms. Wang and defendant stayed at the Huangs' house while the two boys swam in the indoor pool.

At this point, defendant and prosecutrix's recollection of events diverge. Defendant testified that Ms. Wang asked to see his Persian rugs. After having viewed several downstairs rugs, she asked to see the upstairs rugs. She and defendant climbed a spiral stair-

case to the den located directly above the swimming pool. From there, they could hear the boys playing in the pool because the house's interior was open. After examining the rugs in the den, Ms. Wang walked through the upstairs area to look at other rugs with defendant following her. According to defendant, she walked into a bedroom which had no rug and requested to see the other rugs. Defendant retrieved a rug, brought it into the bedroom and put it over ·the bed for her examination. She examined two rugs in this manner and asked to see another. Defendant responded that he had no more and then requested that she return to the hallway. Defendant testified that he was concerned about the children in the pool and about his wife's return. As they retreated down the hallway, defendant suggested that they go downstairs to check on the children. At that point, Ms. Wang thanked him for showing her the rugs and hugged him very tightly. Defendant testified that her show of affection was powerful and that it caught him off guard, resulting in a loss of balance and their fall to the floor. Defendant believed their ankles crossed during the fall. While on the floor, defendant testified that Ms. Wang nibbled on his right ear lobe. They then went downstairs where the boys were still playing in the pool. Defendant testified that a scream or yell from the upstairs area would have been discernible to anyone in the swimming pool area. Defendant testified that Ms. Wang was upset following the hallway incident, and she asked him not to tell anyone about it. Defendant testified that he did not assault Ms. Wang in any manner.

Ms. Wang testified that after defendant's wife left, he came out to the pool and began talking about some carpets. He insisted that she accompany him upstairs to see the carpets. She did so and first viewed carpets in the den and upstairs hallway. Defendant then led her into one of the bedrooms to see "the very best rug he had." The rug was draped across the bed, and defendant asked her to sit on the rug. Ms. Wang decided to return to the pool area but as she walked down the hallway, defendant grabbed her from behind and would not let her go. In terror, she struggled vigorously to escape while defendant laughed. She and defendant struggled down the hallway and eventually he pushed her to the floor and pinned her there by pressing his ankles against her ankles with great force. As she continued to struggle, defendant dragged her onto a bed. She testified that he then fondled her breasts and would not release her until she bit him very hard on the

ear. She testified that he backed away and then pulled her off the bed and dragged her back into the hall. He again pushed her to the floor and pinned her there while she yelled two or three times for her son. Defendant complained a few minutes about his wife and then released Ms. Wang. Ms. Wang further testified that she retrieved her son from the pool and waited for defendant to return a video tape of hers. She testified that she incurred physical injuries as a result of the 19 June incident, including bruises on the inside of her right arm, her ankle and her back. The State introduced into evidence photographs of the various bruises described by Ms. Wang.

That evening, Ms. Wang told her husband that defendant had. tried to rape her. Also that evening, she called the Rape Crisis Center. The following day, Ms. Wang and her husband decided that they would speak with defendant's wife and Ms. Wang reported the incident to the police.

The trial court admitted the expert testimony of Susan Roth, Ph.D., into evidence over defendant's objection. Dr. Roth's doctorate degree is in psychology. She is a member of the American Psychological Association and of the Society for Traumatic Stress Studies. Among other qualifications, she is on the editorial board of the Journal of Traumatic Stress, and has served as consultant for The National Stress Foundation. She has directly treated approximately 20 patients for sexual abuse, supervised the treatment of approximately 15 more, and has interviewed approximately 25 patients for research purposes. She testified that her area of expertise includes rape victims' behavior and their coping mechanisms for trauma and stress. Defendant did not object to the trial court's qualifying her as a clinical psychology expert on the behavior and treatment of sexual assault victims.

Dr. Roth testified that she first treated Ms. Wang in early July 1988, and has met with her nineteen times. She stated that Ms. Wang related to her essentially the same account of the 19 June occurrence at defendant's house as the account to which Ms. Wang had earlier testified. Dr. Roth repeated this history in summary fashion.

Dr. Roth then defined Post Traumatic Stress Disorder (PTSD) for the jury, using four criteria from the diagnostic manual of the American Psychiatric Association. In brief, she described these categories as (1) the experience of an event outside the range

of usual experience; (2) psychological re-experience of the event or circumstance; (3) avoidance of the event or circumstances; and (4) increased psychological arousal.

Dr. Roth testified in detail about the symptoms Ms. Wang exhibited which correlated with the PTSD symptoms. These included "recurrent and intrusive distressing recollections of the event," nightmares, efforts to avoid thoughts or feelings about the event, diminished interest in significant activities, emotional and social withdrawal, insomnia, irritability, hypervigilance and lack of concentration. At no time did Dr. Roth explicitly state that Ms. Wang suffered from PTSD.

For the jury's understanding, Dr. Roth discussed at length the "psychological process that underlies the symptoms," in which she explained traumatic psychological experience in general and Ms. Wang's traumatic experience in particular. She stated in part:

> In Grace's case in particular, she became very fearful both of *Mr. Huang* and also just more generally, she felt very vulnerable in the world. She also had a sense of real loss about the relationship with *Mr. Huang's* wife. . . . One does not expect a *friend* to attack you, to violate your integrity, to violate your space. . . . So, when it happens at the hands of a *friend*, it violates the sense of trust even more. I think *in terms of justice* what is very important to understand is that Grace spent a lot of time trying to understand how could this have happened, *how could something this unjust* have happened and this again is all part of the psychological process you see in response to a traumatic event.

(Emphases added.)

Last, Dr. Roth testified that Ms. Wang had not told her of any events which occurred at approximately the same time as defendant's alleged attack which could account for the symptoms she observed.

---

The dispositive issue is whether Dr. Roth's testimony on Post Traumatic Stress Disorder was properly admitted into evidence during defendant's trial for the offenses of attempted second-degree rape and assault on a female.

There are several relevant rules for the admissibility of expert testimony. (1) The witness's qualifications include "knowledge, skill, experience, training, or education. . . ." N.C.G.S. 8C-1, Rule 702 (1986). "It is enough that through study or experience the expert is better qualified than the jury to render the opinion regarding the particular subject." *State v. Howard*, 78 N.C. App. 262, 270, 337 S.E.2d 598, 604 (1985), *review denied, appeal dismissed*, 316 N.C. 198, 341 S.E.2d 581 (1986). Whether the "witness qualifies as an expert is exclusively within the discretion of the trial judge. . . ." *Id.*, 337 S.E.2d at 603. Absent a specific request, the trial court is "not required to make specific findings of fact" concerning the expert's qualifications. *State v. Bullard*, 312 N.C. 129, 144, 322 S.E.2d 370, 378 (1984). (2) The testimony of the expert must be helpful to the jury. *In re Wheeler*, 87 N.C. App. 189, 196, 360 S.E.2d 458, 462 (1987); *see also* 3 H. Brandis, *Brandis on Evidence* 134 (1988). (3) The expert's scientific technique on which he bases his opinion must be such that its "accuracy and reliability has become established and recognized." *State v. Temple*, 302 N.C. 1, 12, 273 S.E.2d 273, 280 (1981). However, the focus is on the reliability of the scientific method "rather than 'its establishment and recognition.'" *Bullard*, 312 N.C. at 149, 322 S.E.2d at 381. (4) The evidence must be relevant. N.C.G.S. 8C-1, Rule 401 (1986). Evidence is relevant if it "has any logical tendency[,] however slight[,] to prove the fact at issue in the case." *State v. Pratt*, 306 N.C. 673, 678, 295 S.E.2d 462, 466 (1982). It is relevant if it can assist the jury in "understanding the evidence." *State v. Kennedy*, 320 N.C. 20, 32, 357 S.E.2d 359, 366 (1987). (5) The probative value of the evidence must not be "outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." N.C.G.S. 8C-1, Rule 403 (1986). (6) The witness may offer testimony "in the form of an opinion or inference . . ." even though it may embrace the ultimate issue to be decided by the jury. N.C.G.S. 8C-1, Rule 704 (1986). However, the expert may not testify that "such a particular legal conclusion or standard has or has not been met. . . ." *State v. Smith*, 315 N.C. 76, 100, 337 S.E.2d 833, 849 (1985). (7) "[E]xpert testimony of the credibility of a witness is not admissible." *State v. Hall*, 98 N.C. App. 1, 11, 390 S.E.2d 169, 174 (1990); *see* N.C.G.S. 8C-1, Rule 405(a) (1986); N.C.G.S. 8C-1, Rule 608, Commentary (1986) ("the reference to Rule 405(a) [in Rule 608] is to make it clear that expert testimony on the credibility of a witness is not admissible").

Defendant argues that Dr. Roth's testimony on PTSD was not helpful to the jury, constituted expert testimony about the prosecuting witness's credibility, was irrelevant, was unfairly prejudicial, and utilized a fact-finding technique which had not gained general acceptance.

This court has determined that "evidence on PTSD would be admissible in North Carolina courts" when defendant was charged with second-degree rape, second-degree sexual offense, assault on a female and first-degree kidnapping. *State v. Strickland*, 96 N.C. App. 642, 648, 387 S.E.2d 62, 66, *rev. denied*, 326 N.C. 486, 392 S.E.2d 100 (1990). In *Strickland*, the expert apparently offered her testimony to rebut defendant's testimony that prosecutrix consented to intercourse. Specifically, the expert testified "that the prosecuting witness's symptoms were consistent with sexual abuse and inconsistent with *consensual* sexual activity" (emphasis added). In a more recent case, this court determined that testimony regarding PTSD was properly admitted "to help the jury determine if a rape had in fact occurred" when defendant was charged with second-degree rape and sexual activity by a substitute parent in violation of N.C.G.S. 14-27.7. *State v. Hall*, 98 N.C. App. 1, 8, 390 S.E.2d 169, 173 (1990). In *Hall*, the expert simply "testified that the prosecutrix had been diagnosed as suffering from PTSD," and nothing in the opinion suggests that the expert offered this testimony in rebuttal. *Id.*, at 7, 390 S.E.2d at 172.

The *Strickland* decision is consistent with decisions in other jurisdictions that allowed PTSD testimony into evidence to rebut defendant's testimony that sexual touching occurred with the prosecuting witness's consent. *E.g., State v. Jackson*, 383 S.E.2d 79, 83 (W.Va. 1989). The *Hall* decision extends this court's decision in *Strickland* to allow PTSD testimony in rape cases to assist the jury in determining if the rape actually occurred, and expands the use of the testimony beyond that of rebutting defendant's contention that the prosecuting witness consented to intercourse.

Here, the State adduced Dr. Roth's testimony in its case-in-chief to show that PTSD is a medically-recognized disorder, that the disorder has specific recognized symptoms and that Ms. Wang's symptoms were consistent with PTSD.

We review this evidence to determine whether the evidence is admissible, consistent with the rules set out above. We find no abuse of discretion in the trial court's determination that Dr.

Roth was qualified as an expert. If believed, her testimony could be helpful to the jury in understanding the behavioral patterns of sexual assault victims. *See Kennedy*, at 32, 357 S.E.2d at 366 (the court allowed an expert to testify that "symptoms exhibited by the victim were consistent with sexual or physical abuse"). This court and courts of other jurisdictions have recognized the reliability of PTSD testimony in sexual assault cases. *See* Cling, *Rape Trauma Syndrome: Medical Evidence of Non-Consent*, 10 Women's Rights Law Reporter 243 (1988); *see also* Note, *Expert Testimony on RTS*, 63 Wash. L.Rev. 1063 (1988); *People v. Taylor*, 552 N.Y.S.2d 883 (1990). Reliability of this testimony is also substantiated by the American Psychiatric Association's recognition of PTSD and its result from trauma such as rape and assault. *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 309.89 (3d ed., rev. 1987). While Dr. Roth's testimony tends to support the victim's credibility, its general effect does not render it inadmissible. *Kennedy*, at 32, 357 S.E.2d at 367. In summary, we determine that Dr. Roth was qualified, that her testimony was helpful to the jury, that it was based on a reliable scientific method, that it was relevant, and that it did not violate the rule prohibiting expert testimony on a witness's credibility.

However, Dr. Roth's testimony violates one of the rules regarding admissibility of expert testimony. The probative value of Dr. Roth's testimony was outweighed by the danger of unfair prejudice and therefore its admission violated Rule 403. As the Supreme Court of Maryland stated in reference to this issue:

> When a trial judge admits PTSD evidence because he believes that the existence of the disorder coupled with the absence of any triggering trauma, other than the evidence of rape, will aid the jury the ruling necessarily carries certain baggage with it. Cross-examination can include not only cross-examining the expert about PTSD in general, but also cross-examining the expert and the prosecutrix about possible causes of the disorder other than the assault charged in the criminal case. In addition, we can foresee cases where the defendant will seek to counter the state's PTSD evidence with his own expert testimony. That can, in turn, lead to issues concerning compulsory psychiatric examination of the complainant by an expert for the defense. Lurking in the background is the nice question of whether the absence of PTSD is provable by the

accused in defense of a rape charge, as tending to prove that there was consent. . . . When ruling on whether to receive state proffered evidence of PTSD a trial judge will have to weigh the benefit of the evidence not only against the potential unfair prejudice, but also against the complexity of possibly accompanying issues and against the time required to properly try the expanded case.

*State v. Allewalt*, 517 A.2d 741, 751-52 (Md. 1986) (citations omitted). Because of the real danger of prejudice to the defendant and because of the possibility that the jury will give the expert's opinion inappropriate weight as " 'a stamp of scientific legitimacy to the truth of the complaining witness's factual testimony,' " such testimony should be admitted cautiously. *State v. Saldana*, 324 N.W.2d 227, 231 (Minn. 1982) (citation omitted).

Here, Dr. Roth explicitly implicated defendant in her testimony regarding the effects of the alleged sexual assault on Ms. Wang. In her testimony, she specifically named defendant twice and repeatedly implicated him as the "friend" who caused Ms. Wang's PTSD by his unexpected and "unjust" attack. This testimony not only directly implicated defendant, but also encouraged the jury's outrage about the injustice of defendant's alleged act. This testimony was erroneously admitted and clearly prejudiced the defendant. *See Wilkinson*, at 570, 247 S.E.2d at 911; *see also State v. Taylor*, 633 S.W.2d 235, 240 (Mo. 1984) (the expert "went too far in explaining his opinion that the victim suffered rape trauma syndrome as a consequence of the incident with the defendant . . .").

Since we determine that the trial court's erroneous admission of the psychologist's PTSD testimony requires a new trial for assault on a female, we do not address defendant's other assignments of error.

New trial.

Judges JOHNSON and PARKER concur.