An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA15-5

Filed: 1 September 2015

Wake County, No. 09 CRS 211758

STATE OF NORTH CAROLINA,

v.

GREGORY ALDON PERKINS.

Appeal by defendant from judgment entered 29 September 2011 by Judge Henry W. Hight, Jr. in Wake County Superior Court. Heard in the Court of Appeals 12 August 2015.

> *Attorney General Roy Cooper, by Assistant Attorney General Amy Kunstling Irene, for the State.*
>
> *Glenn Gerding, for defendant.*

CALABRIA, Judge.

Gregory Aldon Perkins ("defendant") appeals from judgment entered upon a jury verdict finding him guilty of indecent liberties with a minor child. We find no error.

### *I. Background*

This case arises from the relationship between the alleged child victim ("C.A.") and defendant. When C.A. was nine years old, she and her older sister, S.A., began living with their mother ("Joyce") and defendant, who married Joyce in 2001 and became the girls' stepfather.

S.A.—who is five years older than C.A.—neither liked nor got along with defendant. On one occasion when Joyce was out of town, defendant entered S.A.'s bedroom, climbed in the bed, and positioned himself uncomfortably close to her. Although S.A. told Joyce what had happened, they both "brushed it off."

C.A. and defendant's relationship began in a much more positive way. Defendant treated C.A. like a daughter, and he would take her shopping and out to dinner. The two also watched movies and television together. However, defendant took primary responsibility for C.A.'s discipline, calling himself the "master manipulator."

Sometime in late 2002, when C.A. was in fourth grade, she and defendant were sitting on the couch together watching television. Defendant asked if C.A. would like a back rub, and she responded in the affirmative. At defendant's direction, C.A. laid across his lap with her stomach resting on his legs. After rubbing C.A.'s back and touching her butt a few times, defendant slipped his hand under her pants and touched her vagina. After this particular incident, defendant began touching C.A.'s vagina once a week or more. Eventually, defendant and C.A.'s sexual activity

intensified and became more frequent—defendant had C.A. masturbate him to ejaculation; defendant performed oral sex on C.A. and made her perform oral sex on him; and defendant penetrated C.A.'s vagina with his fingers.

During the summer of 2004, before C.A.'s sixth grade year, she and defendant had vaginal intercourse for the first time. Joyce was not at home. Defendant stated his desire to take C.A's virginity, and to that end, he laid a pink blanket down on the bed in his and Joyce's bedroom in case C.A. began bleeding. During the intercourse, defendant, who wore a condom, briefly stopped when C.A. complained of pain, but he eventually fully penetrated her. After defendant ejaculated, C.A. ran to her room and cried.

From then on, defendant and C.A. had vaginal intercourse on a frequent basis, and as much as five times a week; C.A. often covered her chest because she did not want defendant to see her. Defendant did not always use condoms with C.A., but when he did, he disposed of them in public trash cans because he and Joyce did not use condoms when they were intimate. Sometimes Joyce was at work and other times she was home when defendant and C.A. had intercourse. At the behest of defendant, C.A. went on birth control in ninth grade. When C.A. was fifteen years old, she met a boy at the beach during spring break and had anal sex with him. After C.A. told defendant about the spring break incident, he made her have anal sex with him on one occasion.

In general, defendant controlled and manipulated his relationship with C.A. by way of a "deal" that he fashioned with her: if C.A. engaged in sexual acts with him, he would get her new clothes, allow her to have sleepovers, and "unground" her. Despite Joyce's disapproval, defendant helped C.A. buy a used Range Rover and he allowed her to pierce her belly button. But when C.A. refused to sexually gratify defendant, he became angry and would either yell at and ground her or ignore her. Because Joyce was happy and loved defendant, C.A. chose not to tell her mother about his behavior. Defendant told C.A. he would run away or kill himself if she told anyone, which added to her confusion in handling the situation.

In December 2008, defendant and C.A. had sexual intercourse for the last time. About a month later, defendant and Joyce separated, and defendant moved out of the family home. In defendant's absence, C.A. and her mother enjoyed a healthy relationship. However, in Summer 2009, defendant and Joyce began counseling and entertained the idea of reconciling. C.A. told Joyce she did not want defendant to move back into the family home until she had moved out. On 31 October 2009, C.A. told her boyfriend, Kurt, that defendant had sexually abused her. Later that day, C.A. texted defendant and told him that he had really messed her up in the head, but he did not respond. Kurt urged C.A. to tell her mother and S.A. what defendant had done, and when she did so, Joyce called the police.

In early November 2009, Apex Police Detective Worth Brown ("Detective Brown") interviewed C.A. Later that month, Detective Brown and a colleague paid an unannounced visit to defendant, who first refused to talk but eventually agreed to be interviewed at the Apex Police Department. During that interview, defendant denied committing the alleged abuse. Detective Brown referred C.A. to a social worker, who then referred her to the Center for Child and Family Health ("CCFH").

On 5 January 2010, a Wake County Grand Jury indicted defendant on first-degree sexual offense with a child and indecent liberties with a minor child. C.A. began individual therapy with Rebecca Hubbard ("Ms. Hubbard"), a counseling psychologist at the CCFH in February 2010. Ms. Hubbard diagnosed C.A. with post-traumatic stress disorder ("PTSD"), used trauma-focused cognitive behavior therapy to treat it, and continued to hold sessions with C.A. when defendant's case came on for trial in November 2010 before the Honorable Osmond Smith, III in Wake County Criminal Superior Court. Prior to trial, Dr. Cherry Chevy ("Dr. Chevy"), a child psychiatrist at the CCFH, held nine counseling sessions with C.A. and confirmed Ms. Hubbard's diagnosis of PTSD. Dr. Chevy also prescribed antidepressant medication to treat C.A.'s symptoms of major depression disorder. Since the jury failed to reach a verdict on any charges, the trial court declared a mistrial on 29 November 2010.

On 19 September 2011, the case was retried in Wake County Criminal Superior Court before the Honorable Henry W. Hight, Jr. At the retrial, both Ms.

Hubbard and Dr. Chevy testified for the State regarding C.A.'s PTSD diagnosis. Defendant testified on his own behalf and denied all charges against him. Although he acknowledged giving C.A. backs rubs, defendant maintained that he never had any kind of sexual contact with her. According to defendant, when he began dating Joyce, C.A. told him on two occasions that she did not want him to move in and "mess[] up all [her] rules." Defendant also explained that because he was in charge of C.A.'s discipline, he often grounded her for refusing to clean her room or talking back to Joyce. Phone records showed that C.A. sent a text message to defendant's phone on 31 October 2009, but he denied ever seeing it. During her cross-examination of defendant, the prosecutor used a journal C.A. created during her therapy sessions ("therapy journal") with Ms. Hubbard to impeach defendant.

After the jury returned a verdict finding defendant guilty on one count of indecent liberties with a minor child, the trial court sentenced defendant to 16-20 months in the custody of the North Carolina Division of Adult Correction. Defendant appeals.

## II. Analysis

A. Expert Testimony

Defendant first argues the trial court erred in failing to instruct the jury that opinion testimony stating that C.A. suffered from PTSD could only be considered for corroborative purposes.

Because defendant did not object to the challenged testimony at trial, he is entitled only to plain error review of his arguments. *State v. Lawrence*, 365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012).

> [T]he plain error standard of review applies on appeal to unpreserved instructional or evidentiary error. For error to constitute plain error, a defendant must demonstrate that a fundamental error occurred at trial. To show that an error was fundamental, a defendant must establish prejudice—that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty. Moreover, because plain error is to be applied cautiously and only in the exceptional case, the error will often be one that seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.

*Id.* (citations and internal quotation marks omitted).

> Before deciding that an error by the trial court amounts to "plain error," the appellate court must be convinced that absent the error the jury probably would have reached a different verdict. In other words, the appellate court must determine that the error in question "tilted the scales" and caused the jury to reach its verdict convicting the defendant. Therefore, the test for "plain error" places a much heavier burden upon the defendant than that imposed by [N.C. Gen. Stat.] § 15A–1443 upon defendants who have preserved their rights by timely objection. This is so in part at least because the defendant could have prevented any error by making a timely objection.

*State v. Walker*, 316 N.C. 33, 39, 340 S.E.2d 80, 83–84 (1986) (citations omitted).

Here, Dr. Chevy—who specializes in child and adolescent psychiatry—testified as a medical expert and explained that PTSD is a syndrome and anxiety disorder which arises in relation to a traumatic event and manifests itself through three sets

of symptoms—re-experiencing, avoidance, and hypervigilance. According to Dr. Chevy, C.A. displayed all three symptoms. Ms. Hubbard was admitted for her expertise in assessing and treating traumatized children. Because Ms. Hubbard felt C.A. met the symptomatic criteria mentioned above, she also gave her a primary diagnosis of PTSD.

"[E]vidence that a prosecuting witness is suffering from [PTSD] should not be admitted for the substantive purpose of proving that a rape [or sexual abuse] has in fact occurred." *State v. Hall*, 330 N.C. 808, 821, 412 S.E.2d 883, 890 (1992). Although evidence of PTSD does not prove the sexual abuse occurred, it should not be precluded at trial where the relevance to certain disputed issues has been shown by the prosecution. *Id.* Specifically, such evidence may be admissible for corroborative purposes and to aid the jury in understanding certain behavioral patterns of sexual assault victims. *Id.* at 822, 412 S.E.2d at 891. If evidence of PTSD is admitted, the trial court "should take pains to explain to the jurors the limited uses for which the evidence is admitted."[1] *Id.* Nonetheless, the rule "in this

---

[1] In *Hall*, the Supreme Court declared that "the trial court should balance the probative value of evidence of post-traumatic stress, or rape trauma, syndrome against its prejudicial impact under Evidence Rule 403. It should also determine whether admission of this evidence would be helpful to the trier of fact under Evidence Rule 702." 330 N.C. at 822, 412 S.E.2d at 891. The *Hall* Court, however, did not issue a specific mandate that a trial court must set forth specific findings in the record or explicitly announce its rationale from the bench before admitting PTSD evidence. Defendant does not argue that the trial court was required to follow such a procedure, and we find no authority that would support that proposition. Suffice it to say that, in this case, where C.A.'s credibility and her post-assault behavior were central issues, the probative value of the PTSD evidence was not substantially outweighed by the potential for unfair prejudice under Rule 403 and the challenged testimony was helpful to the jury under Rule 702.

State has long been that an instruction limiting admissibility of testimony to corroboration is not required unless counsel specifically requests such instruction. *State v. Quarg*, 334 N.C. 92, 101, 431 S.E.2d 1, 5 (1993) (citing *State v. Smith*, 315 N.C. 76, 82, 337 S.E.2d 833, 838 (1985)).

In the instant case, the trial court did not give a limiting instruction to the jury regarding the challenged opinion testimony. Although defendant could have requested such a limiting instruction as to both Dr. Chevy and Ms. Hubbard's testimony, he failed to do so. Nevertheless, the expert testimony was admissible to corroborate C.A.'s allegations and explain her behavior, such as why she did not report the sexual abuse while it was occurring. Even if an instruction limiting the admissibility of testimony to corroborative or other purposes was required in the absence of a specific request by defendant, such an omission would not rise to the level of a fundamental error. *See State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (defining plain error as "a '*fundamental error*, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done' ") (quoting *United States v. McCaskill*, 676 F.2d 995, 1002 (4th Cir. 1982)).

Furthermore, defendant cross-examined Dr. Chevy and Ms. Hubbard and elicited testimony from both experts that other traumatic events—besides sexual abuse—can cause PTSD. This enabled defendant to clarify that the testimony of both Dr. Chevy and Ms. Hubbard was based on what they observed and what C.A. told

them during therapy, not on opinions that sexual abuse had in fact occurred. Accordingly, for these reasons, the trial court did not err in admitting the challenged expert testimony without giving a limiting instruction to the jury. *See State v. Lark*, 198 N.C. App. 82, 94, 678 S.E.2d 693, 702 (2009) (holding that the trial court—which did not give a limiting instruction to the jury—did not commit plain error in admitting expert testimony that the victim had been "diagnosed with [PTSD] . . . as a result of sexualized trauma" where the defendant failed to request a limiting instruction and cross-examined the expert to clarify that the expert's opinion was based on the victims allegations").

In a related argument, defendant insists that the trial court erred by not giving a limiting instruction as to Ms. Hubbard's testimony regarding "grooming," which describes the process by which a sexual predator forms a special relationship with and gains the trust of a child victim. According to defendant, Ms. Hubbard's PTSD and "grooming" testimony intimated that sexual abuse was the source of C.A's PTSD and "implicated [defendant] as the perpetrator. Once again, because defendant failed to object to this testimony at trial, we conduct a plain error review.

"In a sexual offense prosecution involving a child victim, the trial court should not admit expert opinion that sexual abuse has *in fact* occurred because, absent physical evidence supporting a diagnosis of sexual abuse, such testimony is an impermissible opinion regarding the victim's credibility." *State v. Stancil*, 355 N.C.

266, 266–67, 559 S.E.2d 788, 789 (2002) (citation omitted). But an "expert witness may testify . . . as to the profiles of sexually abused children and whether a particular complainant has symptoms or characteristics consistent therewith." *Id.* at 267, 559 S.E.2d at 789 (citations omitted).

In making his argument, defendant cites *State v. Huang*, where a psychologist testified regarding the effects of an alleged sexual assault on the victim by "specifically naming [the] defendant twice and repeatedly implicat[ing] him as the 'friend' who caused [the victim's] PTSD by his unexpected and 'unjust' attack." 99 N.C. App. 658, 666, 394 S.E.2d 279, 284 (1990). Given the circumstances, this Court held that because the psychologist "not only directly implicated defendant, but also encouraged the jury's outrage about the injustice of defendant's alleged act[,]" her testimony was "erroneously admitted and clearly prejudiced the defendant." *Id.* at 666, 394 S.E.2d at 284.

We find *Huang*, and the other cases cited by defendant, inapplicable to the situation before us. By defendant's own admission, the record reveals no instances where Ms. Hubbard explicitly said sexual abuse was the traumatic event which caused C.A.'s PTSD. C.A. testified that she enjoyed a good relationship with defendant before it changed to a sexual one. Defendant treated C.A. like his own daughter, took her to dinner and movies, and enabled her to go shopping. Eventually, defendant began rubbing C.A.'s back while the two watched television, and his

behavior became increasingly abusive and inappropriate. As a result, the "grooming" testimony tended to strengthen and corroborate C.A.'s testimony that defendant sexually abused her, and it also helped explain the basis for Ms. Hubbard's diagnosis and course of treatment. On these facts, defendant is mistaken in suggesting that Ms. Hubbard's testimony on "grooming" and other topics did anything to encourage outrage on the jury's part. We therefore find no error in the admission of the grooming testimony. *State v. Horton*, 200 N.C. App. 74, 81, 682 S.E.2d 754, 759 (2009) (social worker's testimony regarding "grooming" behaviors employed by defendant "tended to 'strengthen' the child's testimony that she had been sexually abused by Defendant, as it tended to support the proposition that Defendant had 'groomed' the child to facilitate his alleged sexual abuse of the child"). As such, defendant's argument that a limiting instruction was required is without merit. *See, e.g.*, *State v. Jones*, 322 N.C. 406, 414, 368 S.E.2d 844, 848 (1988) ("The admission of evidence which is competent for a restricted purpose will not be held error in the absence of a request by the defendant for limiting instructions.") (citation omitted).

B. <u>State's Cross-Examination of Defendant</u>

Defendant argues the trial court committed plain error when it allowed the State to cross-examine him about whether C.A. was lying by using C.A.'s therapy journal that the trial court had previously ruled inadmissible.

> [I]t remains true that the North Carolina practice is quite liberal and, under it, cross-examination may ordinarily be made to serve three purposes: (1) to elicit further details of the story related on direct, in the hope of presenting a complete picture less unfavorable to the cross-examiner's case; (2) to bring out new and different facts relevant to the whole case; and (3) to impeach the witness, or cast doubt upon [his] credibility.

*State v. Holland*, 150 N.C. App. 457, 467, 566 S.E.2d 90, 96 (2002) (citation omitted) (quotation marks omitted). "[T]he trial court has broad discretion concerning the scope of cross-examination, and this discretion is not limited by the Rules of Evidence." *State v. Cummings*, 352 N.C. 600, 618, 536 S.E.2d 36, 50 (2000). As a general matter, "the scope of permissible cross-examination is limited only by the discretion of the trial court and the requirement of good faith." *Id.* (citation omitted). "Questions asked on cross-examination will be considered proper unless the record shows they were asked in bad faith." *State v. Lovin*, 339 N.C. 695, 713, 454 S.E.2d 229, 239 (1995). Unless supported by the evidence, a prosecutor may not inject her "own knowledge, beliefs, and personal opinions." *State v. Sanderson*, 336 N.C. 1, 14, 442 S.E.2d 33, 41 (1994) (citation omitted).

During a voir dire examination, C.A. identified State's Exhibit 29 as a journal she created while undergoing therapy with Ms. Hubbard. After defendant objected

to the admission of C.A.'s therapy journal, the trial court ruled that neither the document nor its substance could be admitted. However, the trial court ruled "what [C.A.] told the therapist" and "the creation of the story, the fact that it exists, what its use was, is appropriate to come into evidence." The prosecutor acknowledged that the document itself was inadmissible, but also noted that she planned to ask C.A. questions about the document's contents (specifically, the "grooming" section), which prompted the trial court to clarify that "[m]ost of what's in [there] has already been testified to." In essence, the trial court determined—absent any objection from defendant—it was permissible for the State to discuss at least some of the therapy journal's contents. Defendant's trial counsel responded, "Judge, I guess we should just wait and see how it goes, and then if I think it's objectionable, I can object at the time. I think [C.A.] can talk about everything that she went through." During the State's cross-examination of defendant, the prosecutor read aloud portions of the narrative regarding sexual abuse and asked defendant to address the truth of those statements. In doing so, the prosecutor styled her questions in an impeaching manner, such as "[C.A.] made that up?" and "that didn't happen?"

Defendant contends that, by using the journal, the prosecutor "assumed and put before the jury facts not in evidence." Defendant also insists that the State improperly asked defendant whether C.A's trial testimony and therapy journal consisted of lies. In making this particular argument, defendant primarily relies on

*State v. Campbell*, 30 N.C. App. 652, 228 S.E.2d 52 (1976) and *State v. Locklear*, 294 N.C. 210, 241 S.E.2d 65 (1978).

In *Campbell*, where the defense counsel asked a witness for the State "if Alexander Miller were to say it was six weeks later, he'd be lying, wouldn't he?" and the witness replied, "[y]es, [s]ir," the trial court was held to be "correct in striking the [exchange] . . . because the question and answer were highly improper." 30 N.C. App. at 656, 228 S.E.2d at 55. The *Locklear* Court found it to be "grossly improper" and granted a new trial when the prosecutor made the following assertion during cross-examination of a defense witness: "you are lying through your teeth and you know you are playing with a perjury count[.]" 294 N.C. at 215, 241 S.E.2d at 68.

In the instant case, the State did not attempt to admit the therapy journal on cross-examination, but simply asked defendant, rhetorically, to compare his testimony with C.A.'s statements contained in the journal. At that point in the trial, both C.A. and Ms. Hubbard had already testified to several aspects of the therapy journal, including its creation, purpose, and contents. In fact, C.A. testified in detail to many of the incidents later highlighted by the State when it used the journal during defendant's cross-examination. As a practical matter, the State did nothing more than conduct an active contrast of defendant's testimony—specifically, his repeated denial of wrongdoing—with that of C.A. Furthermore, the prosecutor did not inject her own knowledge, beliefs, or personal opinions. Nor did the State *accuse*

defendant of lying; rather, it attempted to impeach defendant and cast doubt on his credibility. Prosecuting attorneys should not be neutral in the discharge of their duties, and the remarks and methods at issue here were neither highly nor grossly improper. For these reasons, the trial court was not required to intervene *ex mero motu* and defendant has failed to prove that the attack on his credibility via C.A.'s therapy journal constituted plain error.

### C. Coerced Verdict

Defendant argues the trial court coerced the jury to reach a unanimous verdict by telling jurors the court required them to do so and gave an incomplete charge under N.C. Gen. Stat. § 15A-1235. According to defendant, the trial court's instructions violated his rights under our State constitution and were erroneous under section 15A-1235.

Pursuant to North Carolina's Constitution,

> No person shall be convicted of any crime but by the unanimous verdict of a jury in open court, except that a person accused of any criminal offense for which the State is not seeking a sentence of death in superior court may, in writing or on the record in the court and with the consent of the trial judge, waive jury trial, subject to procedures prescribed by the General Assembly.

N.C. Const. art. I, § 24. Section 15A-1235 contains permissive guidelines for a trial judge when instructing a deadlocked jury:

> (a) Before the jury retires for deliberation, the judge must give an instruction which informs the jury that in order to

return a verdict, all 12 jurors must agree to a verdict of guilty or not guilty.

(b) Before the jury retires for deliberation, the judge may give an instruction which informs the jury that:

> (1) Jurors have a duty to consult with one another and to deliberate with a view to reaching an agreement, if it can be done without violence to individual judgment;

> (2) Each juror must decide the case for himself, but only after an impartial consideration of the evidence with his fellow jurors;

> (3) In the course of deliberations, a juror should not hesitate to reexamine his own views and change his opinion if convinced it is erroneous; and

> (4) No juror should surrender his honest conviction as to the weight or effect of the evidence solely because of the opinion of his fellow jurors, or for the mere purpose of returning a verdict.

(c) If it appears to the judge that the jury has been unable to agree, the judge may require the jury to continue its deliberations and may give or repeat the instructions provided in subsections (a) and (b). The judge may not require or threaten to require the jury to deliberate for an unreasonable length of time or for unreasonable intervals.

N.C. Gen. Stat. § 15A-1235(a)-(c) (2013).  Because defendant failed to object to the constitutional issue at trial, and the alleged constitutional error occurred during the trial court's instructions to the entire jury, we review for plain error.  *State v. May*, ___ N.C. ___, ___, 772 S.E.2d 458, 462 (2015) (holding that when the trial court instructs the entire jury and the defendant fails to raise constitutional issues

regarding the instruction at trial, plain error review applies). And since "subsections 15A-1235(b) and (c) are permissive, . . . the appropriate standard of review of [a] statutory claim is also plain error review. *Id.* at ___, 772 S.E.2d 458, 463.

"[I]n deciding whether a [trial] court's instructions force a verdict or merely serve as a catalyst for further deliberations, an appellate court must consider the circumstances under which the instructions were made and the probable impact of the instructions on the jury." *State v. Peek*, 313 N.C. 266, 271, 328 S.E.2d 249, 253 (1985). Verbatim instructions from the statute are not required. When jury instructions " 'do not precisely follow the guidelines set forth in [section] 15A-1235,' " our Supreme Court has held that no error arises when " 'the essence of the instructions was merely to ask the jury to continue to deliberate' " without being coercive. *State v. Aikens*, 342 N.C. 567, 580, 467 S.E.2d 99, 107 (1996) (citation omitted).

In the instant case, the initial instructions the trial court gave the jury were similar to the deliberation rules outlined in section 15A-1235, and included the following proviso:

> The attitudes and conduct of jurors at the beginning of their deliberations are matters of considerable importance. It is rarely productive or good for a juror at the outset to make an emphatic expression of his or her opinion of the case or state how he or she intends to vote. When ones [sic] does that at the beginning, a sense of pride may be aroused, and a juror may hesitate to change his or her position of the case even if shown that it is clearly wrong.

The trial court also noted that the "length of deliberations [is] however long it takes, however short or however long. . . . I don't want you to feel pressured on that." After almost three hours of deliberating, the trial court recessed the court until the next morning. While deliberating the next day, the trial court received a note from the jury that read it was unable to reach a final verdict on all twenty counts. The trial court excused the jury for the day and advised the jury to return the following day. On the third day of deliberation, the jury was still unsuccessful in reaching a unanimous verdict in accordance with the trial court's instructions as to all twenty counts. At this point, the trial court advised the jury its verdict would not be accepted by the court because the verdict was not unanimous on all of the counts. Once again, the trial court gave the jury an evening recess.

On the fourth and final day of deliberation, the trial court held a conference with the State and defendant's counsel to discuss the impasse with the jury. It was agreed by both parties that the trial court should implement the *Allen* charge, which is outlined in N.C. Gen. Stat. § 15A-1235(b). The trial court discussed what would be included in the *Allen* charge with the State and defendant's counsel, and both parties agreed on the content of the instructions. After this agreement was reached, the trial court advised the jury of the *Allen* charge. The instructions substantially tracked the language of subsection 15A-1235(b). During the *Allen* charge, the trial court reminded the jury that "no juror, . . . should surrender an honest conviction as to the

weight or effect of the evidence solely because of the opinion of [his or her] fellow jurors or for the mere purpose of returning a verdict." Furthermore, the trial court reminded the jurors to be reasonable in an effort to reconcile their differences, without jurors surrendering their conscientious convictions. Accordingly, the trial court " 'emphasized to the jurors the importance of their individual convictions,' " and did not coerce the jury to reach a unanimous verdict. *May*, ___ N.C. at ___, 772 S.E.2d at 464 (quoting *Aikens*, 342 N.C. at 580, 467 S.E.2d at 107). Defendant has therefore failed to establish that the trial court committed any error, much less plain error, in its instructions to the jury.

### III. Conclusion

The trial court did not err in allowing expert testimony that C.A. suffered from PTSD caused by defendant's abuse. Furthermore, the trial court did not err when it allowed the State to cross-examine defendant about the content of C.A.'s therapy journal. Lastly, the trial court's instructions to the jury did not coerce a verdict. For the reasons stated in this opinion, we hold that defendant's trial was free from error.

NO ERROR.

Judges ELMORE and DILLON concur.

Report per Rule 30(e).