STATE OF NORTH CAROLINA v. BARRY LEE GREEN

No. COA10-84

(Filed 1 March 2011)

### 1. Witnesses— expert testimony—pharmacology—physiology —knowledge—skill—training—education

The trial court did not abuse its discretion in a driving while impaired case by allowing a witness to give expert testimony in the areas of pharmacology and physiology. The witness was better informed than the jury about the subject of alcohol as it related to human physiology and pharmacology based on his knowledge, skill, experience, training, and education.

### 2. Evidence— opinion testimony—post-driving consumption of alcohol—relevancy

The trial court did not err in a driving while impaired case by allowing an expert witness to give opinion testimony regarding defendant's post-driving consumption of alcohol because it did not amount to an opinion about defendant's credibility. Instead, it served to assist the jury in determining whether defendant's blood alcohol content was in excess of the statutory limit imposed under N.C.G.S. § 20-138.1(a)(2).

### 3. Evidence— opinion testimony—alcohol concentration at various times and scenarios

The trial court did not err in a driving while impaired case by allowing an expert witness to testify about defendant's alcohol

concentration at various times and under various scenarios. The opinion testimony went to the weight of the evidence to be considered rather than its admissibility.

**4. Sentencing— aggravating factor—breath alcohol concentration of 0.16 or greater—no Blakely error**

The trial court did not err in a driving while impaired case by finding the aggravating factor that defendant had a breath alcohol concentration of 0.16 or greater. Contrary to defendant's assertion, *Blakely v. Washington* was not implicated because the level four punishment imposed by the trial court was within the presumptive range so that the trial court did not enhance defendant's sentence even after finding aggravating factors. Further, the court acted within its sentencing authority under N.C.G.S. § 20-179.

Appeal by defendant from judgment entered 28 April 2009 by Judge Carl R. Fox in Wake County Superior Court. Heard in the Court of Appeals 29 September 2010.

*Attorney General Roy Cooper, by Assistant Attorney General Kathryne E. Hathcock, for the State.*

*George B. Currin for defendant-appellant.*

BRYANT, Judge.

Because the trial court was within its discretion to allow Paul Glover to testify as an expert witness in the area of physiology and pharmacology, and because Glover's testimony was permissible under Rules 702 and 703 of our Rules of Evidence, there was no error in the·trial court's rulings.

The record evidence tends to show that, on 14 December 2006, at approximately 8:00 p.m., an SUV entered the intersection of Lynn Road and Glendower Road and narrowly avoided colliding with another vehicle, causing that vehicle to crash into a street sign. The SUV continued on Glendower Road until it was stopped by a witness to the incident. The witness pulled along side the SUV and spoke to the driver through her passenger window. The driver "just slowly turned his head to the left side. His eyes were kind of half shut and glazed looking, and he just said: Huuuuh? . . . And he just sat and stared at [the witness], so [she] knew at that time that he wasn't really processing what [the witness] was saying to him." The SUV soon pulled away.

Senior Officer M.D. Larsen, with the Raleigh Police Department, responded to a 9-1-1 call that came in at 8:06 p.m. At 9:38 p.m., after speaking with both the person whom the SUV almost hit and the witness, Officer Larsen traveled to the address at which the SUV was registered and observed a vehicle matching the SUV's description. Officer Larsen asked to speak to the owner. After a few minutes, defendant came down the stairs. Defendant appeared to be "sluggish, slow." "I could smell the odor of mouthwash with a moderate to strong odor of alcohol coming through that." Officer Larsen informed defendant as to why he was there and asked if defendant had had anything to drink. Defendant initially denied having had anything, but soon stated, "Well, maybe I had a glass—one glass of wine." Ultimately, defendant stated that he had consumed five glasses of wine after arriving home at 7:15. Defendant was taken into custody for impaired driving in violation of N.C. Gen. Stat. § 20-138.1. The witness later identified defendant as the SUV driver. At trial, Officer Larsen gave the following testimony:

Q.  Okay. Before you put him under arrest, based on your observations of [defendant], did you form an opinion satisfactory to yourself as to whether or not [defendant] had consumed a sufficient quantity of some impairing substance as to appreciably impair his mental and/or physical faculties?

. . .

A.  It was my opinion that the defendant had consumed a sufficient quantity of an impairing substance so that his mental and physical faculties were both appreciably impaired.

Q.  Did you have an opinion as to what the impairing substance was?

A.  I believed it to be some type of alcohol.

Officer Larsen transported defendant to the Wake County Detention Center, where, at 11:28 p.m., he was administered two sequential tests to determine blood alcohol concentration (BAC). Defendant's lowest result indicated that his blood alcohol concentration was 0.19 grams of alcohol per 100 milliliters of blood.

A trial was held in Wake County District Court before Judge Anne Salisbury. Judge Salisbury found defendant guilty of impaired driving and, on 4 March 2008, entered judgment against him. Defendant appealed to Wake County Superior Court.

On 22 April 2009, Judge Carl R. Fox commenced a jury trial in Wake County Superior Court. Paul Glover, Branch Head for the Forensic Tests of Alcohol, a branch of the North Carolina Department of Health and Human Services, was allowed to testify as an expert in breath alcohol testing, in the Intoxilyzer 5000, and in blood alcohol physiology, pharmacology and related research. Glover testified that he used defendant's test result for blood alcohol concentration taken at 11:28 p.m., and performed retrograde extrapolation to determine defendant's blood alcohol concentration at approximately 8:00 p.m. Glover testified that, at 8:06 p.m., defendant's blood alcohol concentration would have been 0.24.

At the conclusion of the evidence, the jury found defendant guilty of driving while impaired. In accordance with the jury verdict, Judge Fox sentenced defendant to an active term of 120 days but suspended the sentence and placed defendant on unsupervised probation for 12 months. Defendant was further ordered to obtain a substance abuse assessment, surrender his drivers license, and complete 48 hours of community service. Defendant appeals.

---

On appeal, defendant raises the following four questions: Did the trial court err in allowing Paul Glover to give (I) expert testimony in the area of pharmacology and physiology; and (II) opinion testimony on the issue of defendant's post-driving consumption of alcohol and (III) blood alcohol concentration; and did the trial court err in (IV) finding an aggravating factor for sentencing purposes.

*I*

[1] Defendant argues that the trial court abused its discretion in allowing Paul Glover to give expert testimony in the areas of pharmacology and physiology. We disagree.

"Trial courts are afforded wide latitude of discretion when making a determination about the admissibility of expert testimony. Thus, a trial court's ruling on . . . the admissibility of an expert's opinion will not be reversed on appeal absent a showing of abuse of discretion." *State v. Taylor*, 165 N.C. App. 750, 753, 600 S.E.2d 483, 486 (2004) (citation, brackets, and internal quotations omitted).

Pursuant to North Carolina General Statutes, section 8C-1, Rule 702, a witness may be qualified "as an expert by knowledge, skill, experience, training, or education . . . ." N.C. Gen. Stat. § 8C-1, Rule 702(a) (2009). "North Carolina case law requires only that the expert

STATE v. GREEN

[209 N.C. App. 669 (2011)]

be better qualified than the jury as to the subject at hand, with the testimony being 'helpful' to the jury." *State v. Davis*, 106 N.C. App. 596, 601, 418 S.E.2d 263, 267 (1992) (citing *State v. Huang*, 99 N.C. App. 658, 663, 394 S.E.2d 279, 282, *disc. rev. denied*, 327 N.C. 639, 399 S.E.2d 127 (1990)). "It is well-established that trial courts must decide preliminary questions concerning the qualifications of experts to testify or the admissibility of expert testimony." *Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 458, 597 S.E.2d 674, 686 (2004) (citing N.C.G.S. § 8C-1, Rule 104(a) (2003)). In *Howerton*, our Supreme Court set out a three step inquiry governing the admissibility of expert testimony:

> (1) Is the expert's proffered method of proof sufficiently reliable as an area for expert testimony? [*State v. Goode*, 341 N.C. 513, 527-29, 461 S.E.2d 631, 639-40 (1995)]. (2) Is the witness testifying at trial qualified as an expert in that area of testimony? *Id.* at 529, 461 S.E.2d at 640. (3) Is the expert's testimony relevant? *Id.* at 529, 461 S.E.2d at 641.

*Howerton*, 358 N.C. at 458, 597 S.E.2d at 686. Defendant contests the application of the second prong—whether Glover qualified as an expert in the areas of pharmacology and physiology.

According to his *curriculum vitae*, Glover was Branch Head for the North Carolina Department of Health and Human Services, Forensic Tests for Alcohol Branch. In this capacity, his duties included providing scientific expertise and in-the-field guidance; testifying as an expert witness in court proceedings; maintaining a laboratory facility for the scientific analysis of aqueous alcoholic simulator solution and impairing substances including alcohol, in both human breath and blood; evaluating the methodology and techniques related to the testing of blood and urine for the presence of alcohol and other impairing substances; and evaluating new breath alcohol testing technology, so as to accomplish the Branch mandate of maintaining the highest standard of testing. Glover has given testimony as an expert more than 220 times in the past 11 years and assisted with over 600 different cases.

Here, Glover was proffered as an expert in breath alcohol testing; in the Intoxilyzer 5000; and in blood alcohol physiology, pharmacology and related research.

> Q. Now, Mr. Glover, turning your attention to blood alcohol physiology, pharmacology, and related research. First of all, can you explain to the jury what that is?

A. What this is addressing would be how the body deals with alcohol; that is, when it gets—when they consume it, how it goes from being in their mouth to being in their blood to being in their tissues, to being in their brain, and ultimately showing up on their breath. The physiological process is how it's all transported and dealt with.

The pharmacology aspect of it is what the alcohol does to the human body when it's in it.

Related research would deal with the number of studies that have been done for probably the past 70 years where they've looked at those very things. What happens to the alcohol? What areas does it affect? How does it affect people? What effects do we see at different alcohol concentrations?

Glover testified that he received a B.S. and a master's degree in biology from Florida State University in 1974 and 1978, respectively. He worked as a research scientist responsible for giving in-service training to field staff who train officers on how to operate and maintain breath test instrumentation and for evaluating State Bureau of Investigation agents who seek to become blood alcohol chemical analysts.

Glover's curriculum vitae also included courses he took at the Indiana University, Center for Studies of Law in Action, on "Tests for BAC in Highway Safety Programs: Supervision and Expert Testimony" and "The Effects of Drugs on Human Performance and Behavior" and a workshop entitled "Forensic Toxicology Review," presented by the Society of Forensic Toxicologists in the Research Triangle Park. And, since 1998, Glover has attended the annual meeting of the "International Association for Chemical Testing." Glover also testified about his research, which included testing more than 1,000 people over the past 12 years in controlled drinking exercises, to measure blood alcohol concentration. Glover testified that, of the 220 times he had been tendered and qualified as an expert, his testimony included breath alcohol testing greater than 50% of the time and more than 90% of the time included blood alcohol physiology, pharmacology, and related research.

On voir dire, the trial court asked what training Glover had "with respect to this physiology and . . . the elimination of alcohol or the results of alcohol in the body?" Beyond his formal education, Glover's training came from reading peer-reviewed papers, the instruction he received at Indiana University, and his own experience in dosing

individuals with alcohol. Glover testified about the process by which a human body eliminates alcohol, as well as the limited range of alcohol elimination rates observed in studies performed over the past seventy years. Glover provided information and examples as to how an alcohol elimination rate is used in retrograde extrapolation[1] to determine a prior blood alcohol concentration at a relevant point in time.

We also note that Glover has testified as an expert in a number of cases that have come before our appellate courts: *Cook*, 362 N.C. 285, 661 S.E.2d 874; *State v. Borges*, 183 N.C. App. 240, 644 S.E.2d 250 (2007); *State v. Corriher*, 184 N.C. App. 168, 645 S.E.2d 413 (2007) (challenging retrograde extrapolation); *State v. Fuller*, 176 N.C. App. 104, 626 S.E.2d 655 (2006); *State v. Teate*, 180 N.C. App. 601, 638 S.E.2d 29 (2006); *State v. Taylor*, 165 N.C. App. 750, 600 S.E.2d 483 (2004) (challenging retrograde extrapolation); and *State v. Speight*, 166 N.C. App. 106, 602 S.E.2d 4 (2004) (challenging expert status), 359 N.C. 602, 614 S.E.2d 262 (2005) (finding *Blakely* error), *vacated and remanded*, 548 U.S. 923, 165 L. Ed. 2d 983, *rev'd in part*, 361 N.C. 106, 637 S.E.2d 539 (2006).

Based on his knowledge, skill, experience, training, and education, Glover was better informed than the jury about the subject of alcohol as it relates to human physiology and pharmacology. *See* N.C. R. Evid. Rule 702(a); *Davis*, 106 N.C. App. 596, 418 S.E.2d 263. Therefore, the trial court did not abuse its discretion by allowing Glover to testify as an expert in the areas of pharmacology and physiology.

## II

[2] Defendant argues that the trial court erred in allowing Glover to give opinion testimony regarding defendant's post-driving consumption of alcohol. It is his contention that Glover's testimony amounted to an opinion about the truthfulness of defendant's statement to Officer Larsen that he consumed wine after returning home. We disagree.

"If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience,

---

1. "Retrograde extrapolation is a mathematical analysis in which a known blood alcohol test result is used to determine what an individual's blood alcohol level would have been at a specified earlier time. The analysis determines the prior blood alcohol level on the bases of (1) the time elapsed between the occurrence of the specified earlier event (e.g., a vehicle crash) and the known blood test, and (2) the rate of elimination of alcohol from the subject's blood during the time between the event and the test." *State v. Cook*, 362 N.C. 285, 288, 661 S.E.2d 874, 876 (2008).

training, or education, may testify thereto in the form of an opinion." N.C. R. Evid. 702(a). However, "expert testimony on the credibility of a witness is not admissible." *State v. Aguallo*, 318 N.C. 590, 598, 350 S.E.2d 76, 81 (1986) (noting the Official Commentary to Rule 608(a) (Opinion and reputation evidence of character)). "An expert witness' view as to probabilities is often helpful in the determination of questions involving matters of science or technical or skilled knowledge. Expert testimony may be given in terms of an opinion that something might, could or would produce a certain result." *Lockwood v. McCaskill*, 262 N.C. 663, 667, 138 S.E.2d 541, 544 (1964) (citation and emphasis omitted).

Glover defined post-driving consumption as "a situation where we have a driving event, whether it's a vehicle stop or a crash, and then at some point after that event there is a claim of consumption of alcohol." When asked whether he could determine whether post-driving consumption had occurred, Glover responded, "I can evaluate it and give an opinion as to what I'll say is a probability of it." Glover went on to discuss the factors he considered when calculating defendant's blood alcohol content at the time of the 9-1-1 call—8:06 p.m., on 14 December 2006: the alcohol concentration recorded at 11:28 p.m.; the elapsed time; the rate at which a human body eliminates alcohol; defendant's reported size and gender; and defendant's assertions to Officer Larsen that he consumed as little as no alcohol to as much as five glasses of wine. Glover testified that, in performing his calculations, he made certain assumptions, such as: each glass contained five ounces of wine; the wine was 12% alcohol—though he acknowledged that the alcohol content of some wines may be 14% or 20%; and defendant's actual weight was accurately reflected on the police booking sheet. Assuming these factors, and presuming defendant had nothing more to drink after 8:06 p.m., Glover testified that defendant's blood alcohol content would have been 0.24 at the time of the 9-1-1 call; presuming one glass of wine after 8:06 p.m.—0.23 BAC; and presuming five glasses of wine after 8:06 p.m.—0.19 BAC. Glover also testified that, regardless of the number of glasses, if defendant consumed no wine before 8:06 p.m. and registered a 0.19 blood alcohol concentration at 11:28 p.m., defendant would have to have consumed 88 ounces of wine, or just under three quarts, after driving.

This testimony by Glover did not amount to opinion testimony concerning defendant's credibility. *See Id.* (an expert may testify "in terms of an opinion that something might, could or would produce a

certain result."). Therefore, the trial court did not err in allowing Glover to testify as to how defendant's calculated blood alcohol content would have been altered by defendant's stated post-driving consumption, since such statements did not constitute testimony as to defendant's credibility but did serve to assist the jury in determining whether defendant's blood alcohol content at 8:06 p.m. on 14 December 2006 was in excess of the statutory limit of 0.08 imposed under N.C.G.S. § 20-138.1(a)(2) (2009). Accordingly, defendant's argument is overruled.

## III

**[3]** Defendant argues that the trial court erred in allowing Glover to testify to defendant's alcohol concentration at various times and under various scenarios because such testimony was premised upon impermissible factual assumptions. Specifically, defendant contends that Glover's calculations assumed the amount of wine in defendant's glass and when it was consumed. We disagree.

Our General Statutes allow the admission of opinion testimony from those who, by knowledge, skill, experience, training, or education, are deemed experts—if their scientific, technical or other specialized knowledge will assist the fact finder to determine a fact in issue. N.C. R. Evid. 702(a). "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing." N.C. R. Evid. 703 (2009). "North Carolina courts have consistently regarded blood alcohol retrograde extrapolation as the domain of expert witnesses." *Cook*, 362 N.C. at 293, 661 S.E.2d at 879 (citing *State v. Davis*, 142 N.C. App. 81, 89-90, 542 S.E.2d 236, 241 ("examining the 'expert testimony' of a toxicologist under the standard of *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 125 L. Ed. 2d 469 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 143 L. Ed. 2d 238 (1999), and noting '[w]e have accepted the reliability of extrapolation evidence since 1985' "), *disc. rev. denied*, 353 N.C. 386, 547 S.E.2d 818 (2001); *State v. Catoe*, 78 N.C. App. 167, 168-69, 336 S.E.2d 691, 692-93 (1985) ("holding blood alcohol concentration retrograde analysis admissible when a 'qualified expert' gave 'opinion testimony on scientific matters' and noting the 'simple mathematical extrapolation' performed"), *disc. rev. denied*, 316 N.C. 380, 344 S.E.2d 1 (1986)). We are now presented with the issue of whether the trial court properly admitted the opinion testimony of Glover, a witness found to be an expert and qualified to testify regarding retrograde extrapolation, given defendant's assertions of post-driving alcohol consumption.

As previously stated, the trial court must determine whether "the expert's proffered method of proof [is] sufficiently reliable as an area for expert testimony[.]" *Howerton*, 358 N.C. at 458, 597 S.E.2d at 686 (citing *Goode*, 341 N.C. at 527-29, 461 S.E.2d at 639-40). "[T]his requires a preliminary assessment of whether the reasoning or methodology underlying the testimony is sufficiently valid and whether that reasoning or methodology can be properly applied to the facts in issue." *Goode*, 341 N.C. at 527, 461 S.E.2d at 639 (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.* ——, U.S. ——, 125 L. Ed. 2d 469 (1993)).

[I]f "the trial court is without precedential guidance or faced with novel scientific theories, unestablished techniques, or compelling new perspectives on otherwise settled theories or techniques," the trial court must look to other " 'indices of reliability' to determine whether the expert's proffered scientific or technical method of proof is sufficiently reliable[.]"

*Taylor*, 165 N.C. App. at 756, 600 S.E.2d at 488 (quoting *Howerton*, 358 N.C. at 460, 597 S.E.2d at 687).

[T]he trial court should generally focus on the following nonexclusive "indices of reliability" to determine whether the expert's proffered scientific or technical method of proof is sufficiently reliable: "the expert's use of established techniques, the expert's professional background in the field, the use of visual aids before the jury so that the jury is not asked 'to sacrifice its independence by accepting [the] scientific hypotheses on faith,' and independent research conducted by the expert."

*Corriher*, 184 N.C. App. at 171, 645 S.E.2d at 415 (quoting *Howerton*, 358 N.C. at 460, 597 S.E.2d at 687).

[O]nce the trial court makes a preliminary determination that the scientific or technical area underlying a qualified expert's opinion is sufficiently reliable (and, of course, relevant), any lingering questions or controversy concerning the quality of the expert's conclusions go to the weight of the testimony rather than its admissibility.

*Taylor*, 165 N.C. App. at 756, 600 S.E.2d at 488 (quoting *Howerton*, 358 N.C. at 460-61, 597 S.E.2d at 687-88).

Glover testified that he has been qualified as an expert more than 220 times, with his testimony relating to breath alcohol testing

greater than 50% of the time and to blood alcohol physiology, pharmacology, and related research more than 90% of the time (some of those cases, as previously cited, have come before this Court); his research included testing more than a thousand people over the past 12 years in controlled drinking exercises to measure blood alcohol concentration; and he acknowledged studies of alcohol elimination rates in humans that have been performed over the past seventy years. Glover was admitted as an expert in breath alcohol testing, the Intoxilyzer 5000, and in blood alcohol physiology, pharmacology and related research. In his testimony, Glover provided information and examples as to how an alcohol elimination rate is used in retrograde extrapolation to determine a prior blood alcohol concentration at a relevant point in time.

Glover testified that he could "give a calculation as to what the alcohol concentration was at [an] earlier time and then factor in the contribution of what would have been—what was claimed to have been consumed [after the driving incident]." In extrapolating a person's prior blood alcohol content, Glover testified that he looks for the time of the vehicle stop or accident, the time of the alcohol test, whether the test was a blood draw or a breath alcohol test, the size and gender of the individual, and what the person claimed to have consumed.

Q.   And how do you know how to make these types of calculations?

A.   Well, we do controlled drinking exercises on a regular basis . . . . We know—with formulas, we know how much to give a hundred-pound female or a 200-pound male. If they're drinking beer or wine or hard liquor, we know how much—what volume to give them based on their weight and gender in order to get them to a targeted alcohol concentration.

. . .

I can't tell you the number of exercises. I know I've been involved in dosing over a thousand people, and whether it's a thousand or 2,000, over the past 12 years I've been involved in it. My staff has been involved in it. . . . So we dose all kinds of people.

. . .

Q.   And during these controlled drinking sessions, as you've seen the alcohol concentration go down what if any change in behavior have you noticed?

A.  You'll see the person will still be impaired, but you'll see some change, but it takes—it takes time. Your alcohol concentration only goes down approximately 0.0165 per hour, and so the difference from someone who is at a .12 to someone who is at a .11, and an hour goes by, you've only decreased it by .016, so you're not going to see a dramatic change in that period.

As stated before, Glover assumed that each of defendant's glasses contained five ounces of wine consisting of 12% alcohol and that the weight listed on defendant's police booking sheet was accurate. Factoring in those assumptions, Glover calculated that, at the time of the 9-1-1 call, 8:06 p.m., defendant's blood alcohol content would have been 0.24—presuming defendant had nothing more to drink after 8:06 p.m.; 0.23 BAC—presuming defendant had one glass of wine after 8:06 p.m.; and 0.19 BAC—presuming defendant had five glasses of wine after 8:06 p.m. Glover also testified that, regardless of the number of glasses, for defendant to have consumed wine only between the time of the 9-1-1 call, 8:06 p.m., and the time Officer Larsen arrived at his residence, 9:38 p.m., defendant would need to have consumed 88 ounces of wine, or just under three quarts, to register a 0.19 blood alcohol concentration at 11:28 p.m.

Noting Glover's use of retrograde extrapolation—a technique accepted in our courts since 1985 (*see Catoe*, 78 N.C. App. 167, 336 S.E.2d 691 (1985)), and his aforementioned training and experience, including independent research involving the analysis and measurement of blood alcohol concentration and elimination, and his challenge to opinion testimony about defendant's blood alcohol content at various times and under various scenarios based upon defendant's assertions of post-driving alcohol consumption went to the weight of the testimony to be determined by the jury rather than its admissibility so the trial court did not violate the parameters of Rules 702 and 703. *See Corriher*, 184 N.C. App. 168, 645 S.E.2d 413; *Taylor*, 165 N.C. App. 750, 600 S.E.2d at 483. Therefore, the trial court did not abuse its discretion in admitting Glover's testimony. Accordingly, defendant's argument is overruled.

*IV*

[4] Last, defendant argues that the trial court erred by finding the aggravating factor that defendant had a breath alcohol concentration of 0.16 or greater. Defendant contends that such a finding by the court amounted to a *Blakely* error. We disagree.

In *Blakely v. Washington*, the United States Supreme Court evaluated the constitutionality of a statutory scheme allowing trial courts to enhance a defendant's sentence upon finding certain facts.

. . .

[T]he Court cited *Apprendi v. New Jersey*, 530 U.S. 466 (2000), for the proposition that a trial court violates the Sixth Amendment if it finds any fact, other than the fact of a prior conviction, and relies on that fact to impose a sentence "greater than the [statutory] maximum." 542 U.S. at 303. The Court defined "statutory maximum" as the most severe sentence a judge may impose based entirely on facts admitted by the defendant or found by a jury beyond a reasonable doubt. *Id.*

*State v. Norris*, 360 N.C. 507, 513, 630 S.E.2d 915, 918-19 (2006). "Although sentences in the aggravated range require findings of aggravating factors and those in the mitigated range findings of mitigating factors, the trial court is free to choose a sentence from anywhere in the presumptive range without findings other than those in the jury's verdict." *Id.* at 512, 630 S.E.2d at 918.

Under North Carolina General Statutes, section 20-179, the trial court must weigh the seriousness of each aggravating factor and each mitigating factor "in [] light of the particular circumstances of the case." N.C. Gen. Stat. § 20-179 (d) and (e) (2009). "If the judge determines that: . . . (2) [t]here are no aggravating and mitigating factors, or that aggravating factors are substantially counterbalanced by mitigating factors, the judge shall note in the judgment any factors found and the finding that the defendant is subject to the Level Four punishment . . . ." N.C. Gen. Stat. § 20-179(f)(2) (2009).

At the sentencing hearing, the trial court found two aggravating factors: that defendant had an alcohol concentration of at least 0.16 at a relevant time after driving and that defendant had at least one prior conviction of an offense of impaired driving that occurred more than seven years before the date of the current offense. The trial court also found two factors in mitigation: that defendant had a safe driving record; and that defendant obtained a substance abuse assessment. The trial court imposed a level four punishment and sentenced defendant to 120 days imprisonment, which sentence was then suspended and defendant placed on unsupervised probation for 12 months. The level four punishment imposed by the trial court was tantamount to a sentence within the presumptive range, so that the

trial court did not enhance defendant's sentence even after finding aggravating factors. Therefore, *Blakely* is not implicated. *See State v. Hagans*, 177 N.C. App. 17, 31-32, 628 S.E.2d 776, 786 (2006) (noting that "*Blakely* dealt only with the question of whether a trial court may *enhance* a defendant's sentence *above the presumptive range* by unilaterally imposing aggravating factors."). Further, the court acted within the sentencing authority conferred to it under N.C.G.S. § 20-179. Accordingly, defendant's argument is overruled.

No error.

Judges STEELMAN and ERVIN concur.